PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 14-1825

BRUCE GOLDFARB; MICHAEL GALLAGHER,

       Plaintiffs - Appellants,

   and

RUTH SHERRILL; ELIZABETH ARNOLD; MERAB RICE; SHERRY MOORE-
EDMONDS; TIM BULL; JULIA DINKINS,

       Plaintiffs,

    v.

MAYOR AND CITY COUNCIL OF BALTIMORE; CITY OF BALTIMORE
DEVELOPMENT CORPORATION; CBAC GAMING, LLC; CBAC BORROWER,
LLC; MARYLAND CHEMICAL COMPANY, INC.,

       Defendants – Appellees.

Appeal from the United States District Court for the District of
Maryland, at Baltimore.  Richard D. Bennett, District Judge.
(1:13-cv-02768-RDB)

Argued: March 25, 2015          Decided: July 1, 2015

Before TRAXLER, Chief Judge, and KING and AGEE, Circuit Judges.

Vacated and remanded by published opinion.  Judge Agee wrote the
opinion, in which Chief Judge Traxler and Judge King joined.

**ARGUED:** Timothy Robert Henderson, RICH & HENDERSON, PC,
Annapolis, Maryland, for Appellants.  Mary Rosewin Sweeney,

VENABLE LLP, Baltimore, Maryland; Matthew Wade Nayden, BALTIMORE CITY SOLICITOR'S OFFICE, Baltimore, Maryland; Donald James Walsh, OFFIT KURMAN, PA, Owings Mills, Maryland, for Appellees. **ON BRIEF:** Thomas M. Lingan, Kenneth L. Thompson, VENABLE LLP, Baltimore, Maryland, for Appellees CBAC Borrower, LLC, and CBAC Gaming, LLC; Amy Beth Leasure, Elizabeth R. Martinez, BALTIMORE CITY LAW DEPARTMENT, Baltimore, Maryland, for Appellees Mayor and City Council of Baltimore and City of Baltimore Development Corporation.

_____

AGEE, Circuit Judge:

The Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq., "establishes a cradle-to-grave regulatory program for hazardous waste management." Envtl. Tech. Council v. Sierra Club, 98 F.3d 774, 779 (4th Cir. 1996). Several Maryland residents brought statutory claims under the RCRA against the current and former owners of an industrial property in Baltimore alleged to have been contaminated by hazardous waste. The district court granted the property owners' motions to dismiss the claims. For the reasons set forth below, we vacate the district court's judgment and remand for further proceedings.

I.[1]

In 2012, the City of Baltimore[2] ("the City") and CBAC Gaming, LLC ("CBAC Gaming") entered into an agreement to develop a tract of approximately 8.58 acres in Baltimore for use as a

---

[1] Given the posture of this case, we accept as true the facts alleged in the complaint, construing them in the light most favorable to the plaintiffs-appellants. See Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009).

[2] The City Council of Baltimore, the Mayor of Baltimore, and the City of Baltimore Development Corporation are named party defendants. Though their precise roles varied, the complaint essentially alleges the same conduct against each of them. For purposes of this appeal, these parties will be collectively referred to as "the City."

casino and ancillary facilities ("the Casino Site"). As a part of the arrangement, the City transferred ownership of some of the land (the "Warner Street Properties") to CBAC Borrower, LLC, a subsidiary of CBAC Gaming, while it retained ownership of the remaining parcels (the "Russell Street Properties").[3] Although ownership of the Casino Site is divided, CBAC Gaming alone will operate the casino and related facilities.

Prior to the Casino Site development, the property had been the location of "various industrial uses" for over a century. (J.A. 18.) In particular, Maryland Chemical Co., Inc. ("Maryland Chemical") previously owned the Russell Street Properties, where it conducted "chemical manufacturing and/or bulk chemical storage, repackaging and distribution" for approximately fifty years. (J.A. 18.)

The City also owns adjacent property (the "Waterfront Parcels") located between the Casino Site and the Middle Branch of the Patapsco River. Given the topography of the area, the Casino Site and Waterfront Parcels "slope[] downward to the southeast" until reaching the shoreline of the river. (J.A.

---

[3] Defendant CBAC Gaming, LLC "is a consortium of investors formed to develop and operate the proposed" casino. (Appendix ("J.A.") 15.) CBAC Borrower, LLC "is an indirectly wholly-owned subsidiary of CBAC Gaming." (J.A. 15.) Although their precise roles vary, these parties will be referred to collectively as "CBAC Gaming," as they can be properly treated as one entity for the purposes of our analysis.

4

17.) The Waterfront Parcels are used for various recreational activities, and include a pathway for biking, running, and walking.

Relying on environmental assessments performed in the 1990s and early 2000s, Plaintiffs Bruce Goldfarb, Michael Gallagher, and Tim Bull (collectively "Goldfarb") allege that hazardous waste contaminates portions of the Casino Site and has been migrating to the Waterfront Parcels and Middle Branch. Goldfarb, who utilizes the recreational activities available in and around the Waterfront Parcels and Middle Branch, filed a Complaint in the United States District Court for the District of Maryland alleging that the City, CBAC Gaming, and Maryland Chemical's actions (and inactions) on the Casino Site violate RCRA.

The City, CBAC Gaming, and Maryland Chemical each moved to dismiss under Rule 12(b) of the Federal Rules of Civil Procedure. The district court granted the motions as to all claims against all defendants, though its specific reasoning was sometimes imprecise and it varied as to each defendant and claim. More will be said about the court's specific rationales below.[4]

---

[4] Several of the district court's rulings are not challenged on appeal. It granted a motion to file a surreply brief; it concluded that although Goldfarb and his remaining co-appellants (Continued)

Goldfarb timely appeals from the district court's order dismissing the Complaint. We have jurisdiction under 28 U.S.C. § 1291.

## II.

"RCRA is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." Meghrig v. KFC W., Inc., 516 U.S. 479, 483 (1996). Its "primary purpose . . . is to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health and the environment.'" Id. at 483 (quoting 42 U.S.C. § 6902(b)); see also H.R. Rep. No. 94-1491(I), at 4 (1976), reprinted in 1976 U.S.C.C.A.N. 6238, 6241 (stating that the purpose behind RCRA was to "eliminate[] the last remaining loophole in environmental law" by regulating the "disposal of discarded materials and hazardous wastes").

Although the Administrator of the EPA has chief responsibility for implementing and enforcing RCRA, "private

_____

had standing to bring this action, several of the other plaintiffs lacked standing and should be dismissed from the suit; and it concluded that the plaintiffs had satisfied § 6972(a)'s notice requirements. None of these rulings are challenged on appeal, and our decision does not affect them.

6

citizens [can] enforce its provisions in some circumstances."
Meghrig, 516 U.S. at 484 (citing 42 U.S.C. § 6972). In relevant
part, § 6972(a) provides that "any person may commence a civil
action on his own behalf--"

> (1)(A) against any person . . . who is alleged to be
> in violation of any permit, standard,
> regulation, condition, requirement,
> prohibition, or order which has become
> effective pursuant to [RCRA]; or
>
> (B) against any person . . . who has contributed or
> who is contributing to the past or present
> handling, storage, treatment, transportation,
> or disposal of any solid or hazardous waste
> which may present an imminent and substantial
> endangerment to health or the environment[.]

"Thus, a suit pursuant to subsection (a)(1)(A) must be based on
an ongoing violation, whereas a suit under (a)(1)(B) may be
predicated on a [qualifying] past [or present] violation."
Sanchez v. Esso Standard Oil Co., 572 F.3d 1, 7 (1st Cir. 2009)
(emphases added); see discussion infra Section IV.A. As their
plain language indicates, each subsection contains different
elements and targets somewhat different conduct.

Subsection (a)(1)(A) authorizes so-called "permitting
violation claims" to be brought against a defendant who is
alleged "to be [currently] in violation" of a RCRA-based
mandate, regardless of any proof that its conduct has endangered
the environment or human health. The permit, etc., subject to
suit under subsection (a)(1)(A) can be either a state or federal

7

standard that became effective pursuant to RCRA. See § 6972(a)(1)(A); Ashoff v. City of Ukiah, 130 F.3d 409, 411 (9th Cir. 1997) ("[I]f state standards 'become effective pursuant to' RCRA, a citizen can sue in federal court to enforce the standard."). This is so because RCRA "authorizes the states to develop and implement their own hazardous waste management scheme[s] 'in lieu of the federal program,'" Safety-Kleen, Inc. v. Wyche, 274 F.3d 846, 863 (4th Cir. 2001) (quoting 42 U.S.C. § 6926), so long as the state system is at least the "equivalent" of the federal program. § 6929(b). Maryland is authorized to operate such a parallel regulatory system, and has adopted the statutory and regulatory framework to do so. See Notice of Final Determination on Maryland's Application for Final Authorization [under RCRA], 50 Fed. Reg. 3511 (Jan. 25, 1985). To remedy a subsection (a)(1)(A) violation, the district court has authority to enforce the "permit, standard, regulation, condition, requirement, prohibition, or order" at issue. § 6972(a).

At the same time, subsection (a)(1)(B) authorizes so-called "imminent and substantial endangerment" claims to be brought against a defendant whose conduct -- whether ongoing or purely in the past -- "may" now pose an "imminent and substantial endangerment to health or the environment." In contrast to claims brought under subsection (a)(1)(A), claims under

8

subsection (a)(1)(B) may be brought regardless of whether the plaintiff can demonstrate that the defendant's actions violated a specific RCRA-based permit, etc. See AM Int'l, Inc. v. Datacard Corp., 106 F.3d 1342, 1349-50 (7th Cir. 1997). The district court has authority to restrain any person who has "contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste" referenced in subsection (a)(1)(B). § 6972(a).

Lastly, to remedy a violation of either subsection, the district court has authority "to order [a defendant] to take such other action as may be necessary." § 6972(a).

We review de novo both the district court's Rule 12(b) dismissal and its statutory interpretation. Pitt Cnty. v. Hotels.com, L.P., 553 F.3d 308, 311 (4th Cir. 2009) (Rule 12(b)(1) dismissal); Eisenberg v. Wachovia Bank, N.A., 301 F.3d 220, 222 (4th Cir. 2002) (Rule 12(b)(6) dismissal); In re Sunterra Corp., 361 F.3d 257, 263 (4th Cir. 2004) (statutory construction).

## III.  Claims Against CBAC Gaming

The Complaint alleges that although CBAC Gaming agreed to engage in certain remedial activities as part of the construction of the casino and its ancillary facilities, those

9

undertakings did not comply with RCRA and so did not adequately address contamination at the Casino Site. Furthermore, the Complaint alleged that CBAC's Casino Site construction activities would continue to contribute to and exacerbate existing contamination in the soil and groundwater, as well as its migration to the Waterfront Parcels and Middle Branch. In particular, Goldfarb pled that CBAC Gaming's development actions violated subsection (a)(1)(A) because they entailed generating, treating, storing, disposing of, and transporting hazardous wastes without the requisite permits. In addition, the Complaint alleged CBAC Gaming's construction activities violated subsection (a)(1)(B) because they contributed to hazardous waste contamination that presented an imminent and substantial endangerment to human health and the environment.

CBAC Gaming moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim. In relevant part, CBAC Gaming contended that the claims against it should be dismissed under RCRA's anti-duplication provision, 42 U.S.C. § 6905(a). According to CBAC Gaming, its National Pollutant Discharge Elimination System ("NPDES") permit, which permitted discharge of stormwater during construction of the casino, shielded it from RCRA liability.

10

The district court granted CBAC Gaming's motion to dismiss based on that general defense. The court's analysis was somewhat convoluted, but tracked the following course: Under RCRA's anti-duplication provision, activities regulated by the Clean Water Act ("CWA") cannot also be regulated by RCRA if enforcement of both Acts would lead to inconsistent requirements. See § 6905(a). The CWA regulates, among other things, the discharge of pollutants from point sources into navigable waters. To comply with the CWA, Maryland issued a general construction stormwater permit (the NPDES permit), and CBAC Gaming was required to comply with that permit during the course of the casino construction activities. Under the terms of the NPDES permit, CBAC Gaming must comply with erosion and sediment control and stormwater management plans. Those plans, in turn, mandated that CBAC Gaming comply with specific remediation activities set forth in a Response Action Plan ("RAP") that CBAC Gaming voluntarily performed as part of its participation in Maryland's Voluntary Cleanup Program. As a result, the remediation activities contained in the RAP had effectively been incorporated into the provisions of the NPDES permit and were no longer voluntary. The NPDES permit thus regulated more than just point source stormwater discharge from the Casino Site, but also covered CBAC Gaming's other construction activities at the Casino Site by virtue of the

11

erosion and sediment control and stormwater management plans and the RAP. So long as CBAC Gaming complied with those approved activities, the NPDES permit shielded CBAC Gaming from liability under the CWA. Following this path of reasoning, the district court concluded that the NPDES permit shielded CBAC Gaming from liability under RCRA since "further remedial requirements imposed under RCRA would be inconsistent with the remedial activities already deemed appropriate for the [Casino] Site" under the NPDES permit. (J.A. 81.)

In granting the motion to dismiss as to CBAC Gaming, the district court did not state whether its ruling was based upon Rule 12(b)(1) or Rule 12(b)(6). Recognizing the district court's lack of clarity on this point, the parties devote considerable space on brief to threshold issues that are contingent upon which rule the district court in fact utilized. For example, only under Rule 12(b)(1) would it matter whether RCRA's anti-duplication provision implicates subject matter jurisdiction. What is more, our inquiry would not be as concerned with what materials the district court relied on to reach its conclusion. E.g., In re KBR, Inc., 744 F.3d 326, 333-34 (4th Cir. 2014) ("When a defendant challenges subject matter jurisdiction via a Rule 12(b)(1) motion to dismiss, the district court may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting

12

the proceeding to one for summary judgment. However, when the jurisdictional facts are inextricably intertwined with those central to the merits, the district court should resolve the relevant factual disputes only after appropriate discovery." (internal alterations, quotation marks, and citations omitted)). By contrast, only under Rule 12(b)(6) does it matter whether the district court violated Rule 12(d)'s limitation on what materials the court can rely on without converting the motion to dismiss into one for summary judgment. Accord Fed. R. Civ. P. 12(d) (specifying the process a court must follow when converting a Rule 12(b)(6) motion to dismiss to a motion for summary judgment after a district court has been presented with and not excluded "matters outside the pleadings"); Hall v. Virginia, 385 F.3d 421, 424 n.3 (4th Cir. 2004) (observing that a court does not convert a motion to dismiss to a motion for summary judgment when it takes judicial notice of public records); Zak v. Chelsea Therapeutics Int'l Ltd., 780 F.3d 597, 607 (4th Cir. 2015) (same, for judicial notice of adjudicative facts under Federal Rule of Evidence 201).

In some cases it could be appropriate to remand for the district court to clarify the basis for its determination. Here, however, we must vacate the district court's ruling because dismissing the Complaint under either Rule 12(b)(1) or

13

Rule 12(b)(6) was incorrect.  A remand for clarification would thus be pointless.

## A.  Rule 12(b)(1)

"To ward off profligate use of the term 'jurisdiction,'" the Supreme Court "adopted a 'readily administrable bright line' for determining whether to classify a statutory limitation as jurisdictional." Sebelius v. Auburn Reg'l Med. Ctr., 133 S. Ct. 817, 824 (2013) (quoting Arbaugh v. Y & H Corp. 546 U.S. 500, 516 (2006)).  Absent Congress "clearly stat[ing] that a threshold limitation on a statute's scope shall count as jurisdictional," "courts should treat the restriction as nonjurisdictional in character." Arbaugh, 546 U.S. at 515, 516. Assuming the district court viewed the RCRA anti-duplication provision as jurisdictional, and dismissed under Rule 12(b)(1) for lack of jurisdiction, it erred.[5]

While the anti-duplication provision may ultimately bar a plaintiff from obtaining relief in a RCRA suit, that result does not mean that the statutory limitation is a jurisdictional

---

[5] The district court's opinion gives us some basis for inferring that it relied on Rule 12(b)(1).  Most pointedly, the district court addressed the claims against CBAC Gaming in a different section than the one containing the heading: "Failure to State a Claim Under Rule 12(b)(6) and Iqbal/Twombly," which introduces the court's analysis as to the other defendants. (J.A. 82.)

14

barrier to recovery. See Arbaugh, 546 U.S. at 515. Instead, when we examine its plain language, § 6905(a) does not suggest a jurisdictional character:

> Nothing in this chapter [i.e., RCRA] shall be construed to apply to (or to authorize any State, interstate, or local authority to regulate) any activity or substance which is subject to the [CWA] . . . except to the extent that such application (or regulation) is not inconsistent with the requirements of [the CWA, among other federal statutes].

§ 6905(a).

The statute simply instructs that RCRA provisions must give way when enforcement would be "inconsistent" with any of the other delineated acts. See Coon ex rel. Coon v. Willet Dairy, LP, 536 F.3d 171, 174 (2d Cir. 2008) (relying on the anti-duplication provision to prohibit plaintiff's RCRA claims challenging identical activities authorized by a CWA-based permit). Given § 6905(a)'s silence as to jurisdiction and the Supreme Court's guidance, we conclude that the anti-duplication provision implicates the viability of an RCRA cause of action rather than the court's jurisdiction to hear the claim. See Verizon Md., Inc. v. PSC, 535 U.S. 635, 642-43 (2002) ("'[T]he absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, i.e., the court's statutory or constitutional power to adjudicate the case.' As we have said, 'the district court has jurisdiction if the right of the petitioners to recover under their complaint will be

15

sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another,' unless the claim 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous.'" (quoting Steel Co. v. Citizens for Better Env't, 523 U.S. 83, 89 (1998))).  Viewed through this lens, the anti-duplication provision is more in the nature of an affirmative defense like the statute of limitations or the failure to exhaust administrative remedies, which are to be timely asserted by a defendant who chooses to do so.  See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC, 132 S. Ct. 694, 709 n.4 (2012) (noting a dispute amongst federal circuit courts as to whether the ministerial exception to employment discrimination claims was "a jurisdictional bar or a defense on the merits," and concluding that it "operates as an affirmative defense to an otherwise cognizable claim, not a jurisdictional bar . . . because the issue presented by the exception is 'whether the allegations the plaintiff makes entitle him to relief,' not whether the court has 'power to hear the case'" (internal quotation marks and alterations omitted)).  Accordingly, it would have been error to dismiss the Complaint against CBAC Gaming for lack of subject matter jurisdiction pursuant to Rule

16

12(b)(1) because a defense to liability under RCRA based on § 6905(a) does not implicate jurisdiction.

## B.  Rule 12(b)(6)

In a Rule 12(b)(6) context, the reviewing court must determine whether the complaint alleges sufficient facts "to raise a right to relief above the speculative level" and "to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007).  This directive ordinarily limits a court's review to the "well-pled facts in the complaint[, which it must view] in the light most favorable to the plaintiff."  Brockington v. Boykins, 637 F.3d 503, 505 (4th Cir. 2011); see also Clatterbuck v. City of Charlottesville, 708 F.3d 549, 557 (4th Cir. 2013).  While no absolute bar exists, a motion to dismiss under Rule 12(b)(6) does not typically resolve the applicability of defenses to a well-pled claim.  See Tobey v. Jones, 706 F.3d 379, 387 (4th Cir. 2013) (stating a motion to dismiss under Rule 12(b)(6) "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses").

Under narrow circumstances, a court may rely on extrinsic materials to determine a motion to dismiss without converting the proceeding into a motion for summary judgment.  See Fed. R. Civ. P. 12(d) (discussing when conversion occurs and what

17

process must be followed to make it proper); see also Zak, 780 F.3d at 606-07 (discussing when extrinsic materials may be considered without implicating Rule 12(d)). For example, a court may properly take judicial notice of "matters of public record" and other information that, under Federal Rule of Evidence 201, constitute "adjudicative facts."[6] Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009); see Fed. R. Evid. 201(b) (stating, in relevant part, that a "court may judicially notice a fact that is not subject to reasonable dispute because it" "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); Clatterbuck, 708 F.3d at 557 ("[C]ourts may consider relevant facts obtained from the public record, so long as these facts are construed in the light most favorable to the plaintiff along with the well-pleaded allegations of the complaint." (internal quotation marks omitted)).

The parties raise multiple arguments regarding the district court taking judicial notice of certain "facts" in order to decide the motion to dismiss, if indeed the district court did so. Goldfarb asserts the district court converted the motion to dismiss into a motion for summary judgment in violation of Rule 12(d). CBAC Gaming responds that the court did not violate this

---

[6] "Adjudicative facts are simply the facts of the particular case." Fed. R. Evid. 201, Advisory Committee's note.

18

provision because it could have properly taken judicial notice of each of the exhibits it relied on as the basis for its analysis. In particular, it contends that the NPDES permit, the City-approved erosion and sediment control plans and stormwater management plans, and the RAP are each public records containing adjudicative facts subject to judicial notice under Rule 201 of the Federal Rules of Evidence.[7] CBAC Gaming maintains that once the district court in effect took judicial notice of those exhibits and their contents, it was free to interpret their meaning and draw legal conclusions. Goldfarb, in turn, replies that the district court never claimed it was taking judicial notice and therefore necessarily failed to identify what facts it was noticing or provide Goldfarb with notice and an opportunity to respond. Furthermore, Goldfarb contends the exhibits are not public records and that even if the court could properly take notice of their existence, it erred by then relying on their contents for the truth of the matters asserted therein.

---

[7] For example, CBAC Gaming points to language in the NPDES permit not only requiring it to "develop and obtain approval . . . of . . . erosion and sediment control plans . . . and . . . stormwater management plans," Appellees' Designated Exhibits ("Ex.") 169 (§ II.A.3), but also stating that "[v]iolations of plans for construction activity, including applicable Erosion and Sediment Control and Stormwater Management Plans, constitute violations of this permit, State law, and the CWA." (Ex. 176, § VI.A.) It then notes that those plans, in turn, were "subject to the provisions in the final RAP." (Ex. 26, § C 50-06.)

Goldfarb is correct at least to the extent that the district court did not explicitly state that it was taking judicial notice of particular "facts," let alone identify what those "facts" were. Nevertheless, even if we assume that the taking of judicial notice was part of the court's decisional process, we need not address whether the act of taking such notice was erroneous. There are two reasons for this conclusion: First, regardless of how the district court proceeded, we, too, are authorized to take judicial notice in an appropriate case. Fed. R. Evid. 201(d) ("The court may take judicial notice at any stage of the proceeding."); Massey v. Ojaniit, 759 F.3d 343, 353 (4th Cir. 2014) (observing that an appellate court may take judicial notice of the same materials as could a district court). Second, even assuming the district court could properly take judicial notice of the contents of the exhibits, the court's specific legal analysis was incorrect.

To grant the motion to dismiss under Rule 12(b)(6), the district court would have to conclude that § 6905(a) barred a RCRA cause of action as pled against CBAC Gaming because enforcement of RCRA would be "inconsistent" with the CWA. The district court opined to that effect, stating that any "further remedial requirements imposed under RCRA would be inconsistent with the remedial activities already deemed appropriate" for the

20

Casino Site pursuant to the CWA (via the NPDES permit and the documents it incorporated). (J.A. 81.)

Since § 6905(a) (or any other RCRA provision of which we are aware) does not define "inconsistent," we give this word its ordinary dictionary meaning: "lacking consistency: incompatible, incongruous, inharmonious . . . so related that both or all cannot be true." Webster's Third Int'l Dictionary 1144; see also Black's Law Dictionary (10th ed.) ("Lacking agreement among parts; not compatible with another fact or claim."); Oxford English Dictionary ("at variance, discordant, in compatible, incongruous"). To be "inconsistent" for purposes of § 6905(a), then, the CWA must require something fundamentally at odds with what RCRA would otherwise require. See Edison Elec. Inst. v. EPA, 996 F.2d 326, 337 (D.C. Cir. 1993) (rejecting anti-duplication provision argument where petitioners were "unable to point to any direct conflict between" RCRA and another act listed in § 6905(a)). RCRA mandates that are just different, or even greater, than what the CWA requires are not necessarily the equivalent of being "inconsistent" with the CWA.

Although the district court recited the statutory term "inconsistent," it undertook no analysis in its opinion to determine whether a conflict actually existed between the applicable RCRA regulations and the CWA, much less what constituted such a conflict. Instead, the district court's

21

analysis overstates when regulation pursuant to RCRA yields to the CWA.  It is not enough that the activity or substance is already regulated under the CWA; it must also be "incompatible, incongruous, inharmonious."  The district court's conclusion is thus built on the faulty premise that the CWA and RCRA cannot regulate the same activity under any circumstance.[8]  See New Mexico v. Watkins, 969 F.2d 1122, 1131 (D.C. Cir. 1992) (stating § 6905(a) "contemplates joint regulation under both RCRA and [another act listed in § 6905(a)] in certain circumstances"). The district court never stated what the NPDES permit, erosion and sediment control and stormwater management plans, or RAP regulated that was "inconsistent" with the alleged obligations of CBAC Gaming under RCRA.  Nor did the court examine what actions Goldfarb pled CBAC Gaming was required to undertake to comply with RCRA that were "inconsistent" with the NPDES permit and its derivative documents.

The district court simply did not undertake a basic comparison, at least not one discernible from the record, to consider whether RCRA would have required anything of CBAC

---

[8]  The district court also found it significant that Goldfarb's Complaint did not argue that CBAC Gaming had violated any of the erosion and sediment control and stormwater management plans or the RAP.  This, too, does not resolve the inconsistency inquiry under the anti-duplication statute because CBAC Gaming could be in full compliance with those requirements and yet still be in violation of RCRA.

Gaming that would be "inconsistent" with what CBAC Gaming was already required to do to comply with the CWA. Instead, the district court broadly concluded that since all of CBAC Gaming's construction activities would satisfy the CWA as a result of the CWA's permit shield, requiring anything "further" under RCRA would be "inconsistent" with the CWA. As set forth above, more was required. We therefore vacate and remand the district court's decision, if based on Rule 12(b)(6), for the failure to identify how the Complaint's RCRA allegations are "inconsistent" with the CWA. But in so doing, we also note that the procedural posture of this case presents a further ground of concern relating back to the proper scope of a court's review of matters outside the pleadings and the taking of judicial notice. The maze of cross-references to exhibits and interpretations of specific provisions within them makes this case particularly ill-suited to adjudication at the motion to dismiss stage. As noted, CBAC Gaming raised the anti-duplication provision as a potential defense to liability, and it relied almost exclusively on exhibits outside the Complaint in doing so. That alone inclines against deciding the case under Rule 12(b)(6). See Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007) (discussing "the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the

complaint" such that the defense could be the basis for dismissal under Rule 12(b)(6)).

Furthermore, the parties vehemently disagree about the nature and scope of the NPDES permit and other exhibits, putting at issue basic factual matters relevant to interpreting what those exhibits mean and how they relate to the RCRA claims pled against CBAC Gaming. We have intentionally bypassed these arguments and refrained from mining the exhibits to determine what, if anything, we could take judicial notice of on appeal. See Ohio Valley Envtl. Coal. v. Aracoma Coal Co., 556 F.3d 177, 216 (4th Cir. 2009) (declining to take judicial notice of permit decision documents and other exhibits because the party seeking notice sought "notice of its own interpretation of the contents of those documents" and not just notice of their existence). We are mindful that judicial notice must not "be used as an expedient for courts to consider 'matters beyond the pleadings' and thereby upset the procedural rights of litigants to present evidence on disputed matters." Waugh Chapel S., LLC v. United Food & Commercial Workers Union Local, 728 F.3d 354, 360 (4th Cir. 2013).

For all these reasons, we vacate the district court's judgment granting CBAC Gaming's motion to dismiss, and remand for further proceedings consistent with this opinion.[9]

## IV. Claims Against The City

The district court dismissed the § 6972(a)(1)(A) and (a)(1)(B) claims against the City for failure to state a claim. As noted, to survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). This standard requires the complaint to do more than plead facts that are "'merely consistent with' a defendant's liability," but must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Twombly, 550 U.S. at 557). A complaint should "not be dismissed as long as [it] provides sufficient detail about [the] claim to show that [the plaintiff] has a

---

[9] CBAC Gaming urges us to affirm the district court's decision on the alternative basis that it would be appropriate to dismiss the claims against it under a Rule 12(b)(6) analysis that concluded the Complaint failed to adequately allege each component of a § 6972(a)(1)(A) and (B) claims. Given our disposition of the claims against the City and Maryland Chemical, and that we have limited our analysis to those matters addressed by the district court with respect to each defendant and claim, we will similarly limit our review of the claims against CBAC Gaming.

25

more-than-conceivable chance of success on the merits." <u>Owens v. Balt. City State's Attorneys Office</u>, 767 F.3d 379, 396 (4th Cir. 2014).

## A.   Section 6972(a)(1)(A) Claim

The Complaint alleges the City's "acts and/or omissions" with respect to the Casino Site failed to comply with RCRA, in violation of § 6972(a)(1)(A).  (J.A. 32.)  Concluding that the Complaint contained inadequate factual allegations and details pertaining to the alleged contamination at the Casino Site and its potential migration off site, the district court dismissed the Complaint for failure to state a claim under Rule 12(b)(6). (J.A. 86.)  In doing so, the court cited three specific pleading deficiencies: that the Complaint (1) did not contain any "factual allegations to explain how the removal of contaminated soil and/or sources of potential contaminants actually exacerbated or contributed to contamination at the Site"; (2) did not provide any "factual details pertaining to the alleged storage and/or abandonment of leaky drums, [nor had it] identified the specific contaminants associated with that alleged 'disposal'"; and (3) did not plausibly allege facts to support "that the migration of contaminants at the Site occurred during the City's ownership of the Site."  (J.A. 86.)

26

Goldfarb argues on appeal that the district court erred because the Complaint alleges specific facts, which if proven, would support the City's liability under RCRA. The City responds that since the only acts the Complaint alleges it to have undertaken involve the removal of contamination from the Casino Site, there is no set of facts under which it could be liable for generating, handling, treating, storing, transporting, or disposing of hazardous or solid waste as required by RCRA.

We agree with Goldfarb that the Complaint sufficiently alleges an ongoing § 6972(a)(1)(A) violation so as to survive a motion to dismiss. The shortcomings the district court identified either do not exist or did not have to be pled to state a claim at this stage of the proceedings.

To state a claim under subsection (a)(1)(A), Goldfarb had to allege an ongoing "violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to" RCRA. In Paragraphs 91-93, the Complaint alleges the City "allowed illegally stored and/or abandoned drums containing hazardous wastes to leak, spill and/or otherwise release into the Casino Site"; "excavated, moved, mixed, stockpiled, backfilled and/or graded contaminated soils and groundwater"; and "excavat[ed], mov[ed]; mix[ed]; backfill[ed]; and/or grad[ed] contaminated soils and/or

27

groundwater located in and around known hot spots of PCE, TCE and heavy metals." (J.A. 28.) Paragraphs 94-99 allege various activities CBAC Gaming is alleged to have undertaken as part of the casino-related construction, and although CBAC Gaming is the primary developer, the City owns some of the property on which those activities are occurring. Paragraph 101 asserts that the City has

> caused, contributed to and/or exacerbated and will continue to cause, contribute to and/or exacerbate the contamination in the soils and groundwater at the Casino Site and the Waterfront Parcels and the ongoing migration of contamination off-site by, among other things, excavating, moving and mixing hot spots of contamination and/or exposing contaminants in and under the Casino Site and the Waterfront Parcels to increased infiltration of rain water.

(J.A. 29-30.)

The Complaint ties these allegations specifically to subsection (a)(1)(A) by alleging: that the City's activities make it "the current owner[] and operator[] of an unpermitted hazardous waste, treatment, storage or disposal facility" (¶ 117, J.A. 32); that the City "generated 'solid waste' and/or 'hazardous waste'" without complying with applicable standards (¶¶ 118, 122, J.A. 33); that the City's construction activities entailed the treatment, storage, and/or disposal of hazardous waste at the Casino Site, and that the City lacked the requisite permits for owning and operating such a facility (¶¶ 120, 123, 124, J.A. 33-34); and that the above violations "have never been

28

remedied and therefore, are ongoing" (¶ 125, J.A. 34). In conjunction with these allegations, the Complaint cites specific rules promulgated pursuant to RCRA, which Goldfarb contends apply to the City's activities. (J.A. 32-34.)

The foregoing paragraphs in the Complaint assert specific, identifiable actions attributed to the City that allegedly violated RCRA-based mandates, have gone uncorrected, and continue unabated such that the City is still "in violation of" those mandates. We have only briefly touched on subsection (a)(1)(A)'s requirement of an ongoing or current violation, which arises from the statute's "to be in violation of" language. In Gwaltney of Smithfield v. Chesapeake Bay Found., Inc., 484 U.S. 49 (1987), the Supreme Court interpreted identical language in the CWA to require that for the alleged harm to be cognizable, it must "lie[] in the present or the future, not in the past." Id. at 59. That is to say, "to be in violation" does not cover "[w]holly past actions," but rather requires allegations of a "continuous or intermittent violation." Id. at 57. We find it logical and appropriate to apply the same meaning to § 6972(a)(1)(A)'s "to be in violation of" requirement. Indeed, other federal circuit courts have done the same. E.g., Parker v. Scrap Metal Processors, Inc., 386 F.3d 993, 1010 n.20 (11th Cir. 2004) (interpreting § 6972(a)(1)(A)'s "to be in violation of" requirement under

29

Gwaltney to require "a continuous or ongoing violation . . . for liability to attach"); Conn. Coastal Fishermen's Ass'n v. Remington Arms Co., Inc., 989 F.2d 1305, 1315-16 (2d Cir. 1993) (same).

At the same time, we agree with the Second Circuit's view that the § 6972(a)(1)(A) "to be in violation of" language does not necessarily require that a defendant be currently engaged in the activity causing the continuous or ongoing violation. Rather, the proper inquiry centers on "whether the defendant's actions -- past or present -- cause an ongoing violation of RCRA." S. Rd. Assocs. v. IBM Corp., 216 F.3d 251, 255 (2d Cir. 2000); accord § 6972(a)(1)(A). In other words, although a defendant's conduct that is causing a violation may have ceased in the past, for § 6972(a)(1)(A) purposes, what is relevant is that the violation is continuous or ongoing. That inquiry "turns on the wording of the [permit, standard, regulation, condition, requirement, prohibition, or order]" the defendant is alleged to "be in violation" of. S. Rd. Assocs., 216 F.3d at 255.

In the case at bar, some of the City's alleged actions occurred in the past and some are ongoing, but the purported violations of "any permit, standard, regulation, condition, requirement, prohibition, or order" promulgated under RCRA are alleged to be "ongoing." (J.A. 32-34.) The district court will

30

need to consider this distinction in the context of the specific facts developed on remand and the particular regulations at issue. Whether Goldfarb can ultimately prove his numerous allegations -- including whether there are any ongoing violations -- is premature for resolution at this early stage of the litigation. For present purposes, all the Complaint needed to do was "provide[] sufficient detail about [the] claim to show that [the plaintiff] has a more-than-conceivable chance of success on the merits." Owens, 767 F.3d at 396. The Complaint, particularly through the above-cited paragraphs, does so. Consequently, the district court erred in granting the motion to dismiss, and we vacate the district court's judgment as to these claims and remand for further proceedings consistent with this opinion.

## B. Section 6972(a)(1)(B) Claim

Relying on substantially the same alleged conduct recounted above, the Complaint also alleged the City violated § 6972(a)(1)(B) by pleading it "contributed to the imminent and substantial endangerment present at the Casino Site and the Waterfront Parcels" by exacerbating known contamination and taking no action to curtail its continued migration. (J.A. 35-36.) The district court concluded the Complaint "failed to state any plausible factual allegations with respect to disposal

31

of hazardous waste (as opposed to removal of contaminated soil and other remedial activities)" and dismissed the subsection (a)(1)(B) claim under Rule 12(b)(6). (J.A. 90.)

Goldfarb contends this, too, was error, arguing the court improperly focused exclusively on "disposal of hazardous waste" when the statute also permits claims based on "handling, storage, . . . or disposal of any solid or hazardous waste." Cf. § 6972(a)(1)(B). Goldfarb points to the paragraphs in the Complaint where violations for "handling" and "storage" are pled. In addition, he argues that "disposal" has a broader statutory definition than the district court recognized, and the Complaint adequately alleges a claim based just on that one component of the statute as well. Pointing to various allegations in the Complaint, Goldfarb asserts it adequately "alleges how [the City is] handling, storing, disposing, etc., the waste . . . by removing leaky drums and underground storage tanks containing such waste as well as by mixing, moving, etc. contaminated soil, subsoil, and groundwater." (Opening Br. 45-46.) Goldfarb maintains these allegations were sufficient to survive a motion to dismiss.

The Complaint had to plausibly allege that the City "has contributed or . . . is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and

32

substantial endangerment to health or the environment" to survive a Rule 12(b)(6) motion.  § 6972(a)(1)(B).  The district court only addressed two components of this claim: contribution and disposal.  It first concluded –– in Goldfarb's favor –– that the Complaint alleged activities that other courts had held would constitute "contribution," i.e., "'active' conduct that may give rise to liability."  (J.A. 90.)  Nonetheless, the district court concluded that the Complaint failed to state a claim because it did not adequately allege that the City's active conduct constituted "disposal . . . (as opposed to removal of contaminated soil and other remedial activities) at the Site."  (J.A. 90.)  We find that, here, the district court erred.

As Goldfarb points out, that aspect of a subsection (a)(1)(B) claim can be satisfied by alleging "handling, storage, treatment, transportation, or disposal," and the district court only noted the absence of "disposal."  (Emphasis added.)  This was error because, at a minimum, the Complaint alleges affirmative acts by the City that consist of both "handling" and "disposal."  "Handling" is not defined in the relevant statute or regulations, but its ordinary definition is broad, "[t]he action or an act of dealing with a . . . thing; treatment; management[.]"  Oxford English Dictionary.  "Disposal," which is defined by regulation, is similarly expansive: "the discharge,

33

deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 40 C.F.R. § 260.10; COMAR 26.13.01.03.

As discussed in the context of the subsection (a)(1)(A) claim against the City, paragraphs 91-93 and 137 of the Complaint allege that the City engaged in various activities on the Casino Site that would involve "handling" or "disposal." These activities include allowing leaks, spills, and releases of hazardous or solid waste to occur on the property; excavating and mixing contaminated soil and groundwater; "addressing" and "remov[ing]" contaminated items from the property in a manner that "exacerbated the known contamination at and under the Casino Site and/or the off-site migration of contamination in the soils, soil vapors and/or groundwater." (J.A. 28, 36.) These paragraphs of the Complaint also identify a specific time period during which the activities are alleged to have occurred and some of the chemical substances involved.

The City appears to assert the misdirected response that since its challenged conduct occurred as part of its well-intentioned efforts to remediate contamination, its actions are immune from liability under § 6972(a)(1)(B). Not so. Hazardous

34

waste can be improperly spread, and contamination exacerbated, even during remediation efforts. A party can violate subsection (a)(1)(B) regardless of the reasons for the actions it takes. Of course, whether Goldfarb can ultimately prove the allegations and prevail on his claim is not a matter upon which we can or do speculate, as that is a task for the district court in the first instance. What is relevant in reviewing the claims at the motion to dismiss juncture is that the Complaint sets forth conduct that could plausibly, if proven, constitute "handling" or "disposal." As such, the Complaint adequately alleges this component of a subsection (a)(1)(B) claim.

The City argues that despite any such error by the district court, we could nonetheless affirm the district court's dismissal of this claim based on the Complaint's failure to adequately allege the other aspects of a § 6972(a)(1)(B) claim. To be sure, we could affirm on different grounds if supported fully by the record. See Brewster of Lynchburg, Inc. v. Dial Corp., 33 F.3d 355, 361 n.3 (4th Cir. 1994). But nothing requires us to do so, and we decline to engage in such lengthy alternative analyses here. See Singleton v. Wulff, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below."). The district court is in a better position to consider the parties' arguments in the first instance, which can

be presented at length rather than being discussed in appellate briefs centered on the issues the district court did decide. Because the district court's analysis was incorrect insofar as it went, we vacate its judgment granting the motion to dismiss as to the City. We remand to the district court for further proceedings consistent with this opinion.

### V. Claim Against Maryland Chemical

The district court also dismissed the only claim against Maryland Chemical -- brought under § 6972(a)(1)(B) -- for failure to state a claim. The court reasoned that because the statute requires that a defendant "contribute" to the solid or hazardous waste at issue, the complaint must allege the defendant affirmatively acted to create or cause the contamination in order to survive a motion to dismiss. It concluded that alleging "spilling, releasing, and/or disposing of hazardous wastes" did not satisfy this requirement because those incidents could occur "without any active human participation" by Maryland Chemical. (J.A. 89.)

Goldfarb contends that the district court erred because the Complaint alleges that Maryland Chemical's past operations on the Russell Street Properties led to the current contamination at that site, which is migrating to the Waterfront Parcels and the Middle Branch. He posits that the Complaint thus

36

sufficiently pled Maryland Chemical's "contribution" so as to state a claim under § 6972(a)(1)(B).  We agree.

Although we have not previously opined as to the meaning of § 6972(a)(1)(B)'s "contribution" requirement, we are bound to interpret undefined statutory terms according to their "ordinary meaning."  Russello v. United States, 464 U.S. 16, 21 (1983) (stating congressional "silence compels us to 'start with the assumption that the legislative purpose is expressed by the meaning of the words used'" (quoting Richards v. United States, 369 U.S. 1, 9 (1962)).  Consistent with that guidance, other federal circuit courts have looked to the dictionary definition of "contribute" to conclude that term for RCRA purposes means that a defendant must "be actively involved in or have some degree of control over," "have a share in any act or effect," or "act as a determining factor."  Hinds Invs., L.P. v. Angioli, 654 F.3d 846, 850-51 (9th Cir. 2011); Sycamore Indus. Parks Assocs. v. Ericsson, Inc., 546 F.3d 847, 854 (7th Cir. 2008); Cox v. City of Dallas, 256 F.3d 281, 294 (5th Cir. 2001); United States v. Aceto Agric. Chems. Corp., 872 F.2d 1373, 1384 (8th Cir. 1989).  We adopt this interpretation, which therefore requires a defendant's active conduct on -- rather than passive connection to -- the property in order to be deemed a contributor for § 6972(a)(1)(B) purposes.  See Sycamore Indus. Parks, 546 F.3d at 854.

37

The Complaint adequately alleges such conduct as to Maryland Chemical. Paragraphs 49-51 allege that Maryland Chemical engaged in "chemical manufacturing and/or bulk chemical storage, repackaging and distribution purposes" for over five decades, and that its "past operations at the Russell Street Properties resulted in spills and releases of hazardous substances and/or hazardous wastes including, but not limited to" four specific spills on portions of the Russell Street Properties. (J.A. 18-19.) Paragraph 51 alleges the specific lots on the Russell Street Properties where the spills occurred, and the types of chemicals involved. (J.A. 19.) Paragraph 134, in turn, alleges that Maryland Chemical's "past operations"

> contributed to the imminent and substantial endangerment to human health and the environment which is present at the Casino Site and the Waterfront Parcels by unlawfully spilling, releasing, and/or disposing of hazardous wastes and/or hazardous substances in the soils and groundwater at the Casino Site (including, but not limited to [hazardous chemical compounds]) and by failing to address and/or remediate the contamination thereafter.

(J.A. 35.) Accordingly, the district court erred in dismissing the claim against Maryland Chemical for failure to allege "contribution" under § 6972(a)(1)(B).[10]

---

[10] Since the district court relied, in part, on a case discussing "disposal" rather than "contribution," Nurad, Inc. v. William E. Hooper & Sons Co., 966 F.2d 837 (4th Cir. 1992), we point out that the terms have different meanings. Moreover, once the active component of "contribution" has been
(Continued)

38

As the City did with respect to the subsection (a)(1)(B) claim against it, Maryland Chemical argues that even if the district court erred as to this one aspect of the claim, we could affirm because the Complaint fails to adequately allege the remaining elements of a § 6972(a)(1)(B) claim. We decline to engage in that analysis for the same reasons we limited our review above. We therefore vacate the district court's judgment as to Maryland Chemical and remand this claim for further proceedings consistent with this opinion.

VI.

For the reasons stated above, we vacate the district court's judgment dismissing all of Goldfarb's RCRA claims

---

established, the "handling, storage, treatment, transportation, or disposal" component of the claim presents a separate requirement subject to a different analysis.

For present purposes, we note that RCRA defines "disposal" to mean "the <u>discharge</u> . . . dumping, <u>spilling</u>, <u>leaking</u>, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste may enter the environment or be emitted into the air or discharged into any waters, including ground waters." § 6903(3) (emphases added). As we observed in <u>Nurad</u>, some of these definitions "appear to be primarily of an active voice," while others "readily admit to a passive component: hazardous waste may leak or spill without any active human participation. [It] arbitrarily deprive[s] these words of their passive element [to] impos[e] a requirement of active participation as a prerequisite to" adequately alleging the "disposal" component of a claim. 966 F.2d at 845. Thus, the above-recited language of the Complaint also sufficiently alleges the disposal element of a § 6972(a)(1)(B) claim.

39

against CBAC Gaming, the City, and Maryland Chemical and remand the case for further proceedings consistent with this opinion.

<u>VACATED AND REMANDED</u>